**UNITED STATED DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DOROTHY MONAHAN, on behalf of herself,
and all others similarly situated,

|                       |                               |
|-----------------------|-------------------------------|
|                       | Plaintiff,                    |
| v.                    |                               |
| WAL-MART STORES, INC.,|                               |
|                       | Defendant.                    |

**CASE NO.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

---

## I.    INTRODUCTION

1.       This case involves the marketing and sale of bed linens falsely labeled as "100% Egyptian Cotton" by one of the country's largest retailers, Wal-Mart Stores, Inc. ("Wal-Mart"). For years, under the labels Better Homes and Gardens and Canopy, Wal-Mart sold bed linens, manufactured by Welspun India, Ltd. ("Welspun"), labeled as "100% Egyptian Cotton." Egyptian cotton commands a premium in the market due to its high quality.

2.       Welspun, a large home textile manufacturer based in India and with offices in New York, manufactures and distributes bed linens and other home textiles to Wal-Mart.

3.       In August 2016, Wal-Mart's competitor, Target announced that its investigation showed that Welspun uses inferior and less expensive cottons in many of its bed linens labeled "100% Egyptian Cotton." Target ended its relationship with Welspun, and Welspun admitted, "Without any ambiguity, the fault is on our side."

4.       As early as 2008, Wal-Mart questioned the fiber content of Welspun's products, but continued its relationship with Welspun and continued to sell its products, including bed linens falsely labeled as "100% Egyptian Cotton." After Target's announcement, Wal-Mart conducted a short investigation and in September 2016, discontinued selling Welspun's bed linens labeled "100% Egyptian Cotton," but continued selling other products. Because of Wal-

Mart's conduct, consumers who purchased Welspun bed linens at Wal-Mart overpaid for an inferior product. This action seeks full recompense for consumers.

## II.  PARTIES

### A.  Plaintiff

5.    Plaintiff, Dorothy Monahan, an individual residing in Michigan, purchased Better Homes and Garden bed linens manufactured by Welspun from a Wal-Mart store located in Rochester Hills, Michigan.

### B.  Defendant

6.    Defendant Wal-Mart Stores, Inc. is the largest chain of discount retail stores in the country. It has 11,500 stores worldwide and employs over 1.5 million people in the United States alone. Wal-Mart is incorporated in Delaware, and its corporate office is in Bentonville, Arkansas. Wal-Mart has stores in all 50 states, including several within this District.

## III.  JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendant are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d). Venue is proper in this District because Defendant resides, transacts business, is found and/or has agents in this District, because a part of the events giving rise to Plaintiff's claims occurred in this District, and a portion of the affected interstate trade and commerce, as described below, was carried out in this District.

9.      This Court has personal jurisdiction over Defendant Wal-Mart. Wal-Mart has conducted and continues to conduct business, including operating numerous retail stores in the State of New York and within this District. On information and belief, Wal-Mart sold Welspun bed linens at its stores in this District. Wal-Mart has a long-standing relationship with Welspun USA, which is headquartered in this District and has conducted and continues to conduct business with Welspun USA in this District.

## IV.    FACTS

### A.    The Egyptian Cotton Market

10.      Commercial cotton production for export began in Egypt in the 1820s when a Frenchman discovered a species of cotton growing in a fine garden in Cairo. This cotton species, Gossypium barbadense, was characterized by unusually fine, long silky fibers or "staples." The fibers of Gossypium barbadense, or Egyptian cotton, had the unique property of being strong enough to withstand the new cotton gin, but at the same time being fine enough to create very high thread count textiles.

11.      When the Civil War broke out in the United States in 1861 and disrupted cotton supplies from southern states, Egyptian production skyrocketed. Egyptian cotton soon became synonymous with premium cotton because textiles produced with it were both stronger and softer than textiles produced with other cottons. Indeed, the phrase "Egyptian cotton" has become synonymous with luxurious high-end extra-long staple cotton, which trades on commodity markets for a premium of 100% or more over regular cotton of low or middle staple length.

12.      For much of the modern era, the production of Egyptian cotton was highly subsidized by the Egyptian government. Beginning in the 1990s, however, protectionist policies

were gradually relaxed under the influence of economic policies advocated by the International Monetary Fund. The result has been a slow decline in Egyptian cotton production, which has been exacerbated by political and economic instability. The U.S. Department of Agriculture predicts that in 2016, Egypt will produce only one-third of the cotton it produced in 2006.

13.     Because of falling production, obtaining genuine Egyptian cotton has become increasingly difficult. Because only Gossypium barbadense grown in Egypt can be called Egyptian cotton, the predictable result has been rampant fraud. Indeed, the Cotton Egypt Association estimates that approximately 90% of cotton marketed as "Egyptian cotton" is not, in fact, Egyptian cotton.

   **B.     Wal-Mart Markets And Sells Welspun Bed Linens Falsely Labeled As "100% Egyptian Cotton"**

14.     In corporate presentations, Welspun India claims: "Your comfort is our commitment." Welspun manufactured and distributed bed linens and other home textiles to U.S. retailers, including, but not limited to, Defendant Wal-Mart, Target, JC Penney, and Bed Bath & Beyond.

15.     In the mid-2000s, Welspun determined that one way to increase those profits was to "move[] up the value chain" in the U.S. market by manufacturing and selling purportedly higher end products. As part of that strategy, Welspun began a concerted campaign to distribute home textiles, including bed linens, purportedly made from "100% Egyptian Cotton," which would be perceived as "softer and finer" with "higher counts of yarn" *i.e.,* higher thread counts.

16.     On information and belief, Wal-Mart entered into contracts with Welspun to sell its "100% Egyptian Cotton" bed linens and other home textiles at Wal-Mart stores nationwide. Wal-Mart sold the "100% Egyptian Cotton" bed linens under the labels Better Homes and Gardens and Canopy.

17.     By marketing certain bed linens as "100% Egyptian Cotton," Wal-Mart could sell the bed linens at a significant premium to bed linens not labeled as "100% Egyptian Cotton."

18.     Sometime before August 2016, Wal-Mart's competitor, Target, became aware that Welspun might be substituting cheaper non-Egyptian cotton in its Fieldcrest label bed linens.

19.     On August 19, 2016, after "extensive investigation," Target confirmed that "Welspun substituted another type of non-Egyptian cotton when producing these bed linens between August 2014 and July 2016." On the same day, Target terminated its relationship with Welspun.

20.     After Target's announcement, Welspun admitted to its conduct, stating: "Without any ambiguity, the fault is on our side."

21.     Reportedly, Wal-Mart and other retailers, such as JC Penney and Bed Bath and Beyond, started investigations.

22.     On or about August 23, 2016, Wal-Mart announced that it was reviewing Welspun's cotton certification records.

23.     On or about September 9, 2016, Wal-Mart announced that it would continue doing business with Welspun, but would discontinue selling its bed linens labeled "100% Egyptian Cotton" because it is "unacceptable" that "Welspun has not been able to assure [Wal-Mart] the products are 100 percent Egyptian cotton."

24.     On information and belief, in 2008, approximately eight years before Target confirmed that Welspun used non-Egyptian cotton in its bed linens, Wal-Mart questioned the fiber content of Welspun's bed linens. Wal-Mart has not made its 2008 findings public but continued to sell Welspun's bed linens until September 2016.

25.     Before August 2016, Wal-Mart knew or should have known about the limited supply of Egyptian cotton and its premium cost.

26.     On information and belief, either Wal-Mart learned in 2008 that Welspun's bed linens were not 100% Egyptian cotton and continued to sell them until Target publicly exposed Welspun; or Wal-Mart did not conduct an adequate investigation or maintain sufficient quality control practices to determine and monitor the fiber content of Welspun's bed linens, and therefore knew that it lacked sufficient information to represent the sheets as "100% Egyptian Cotton."

27.     Tellingly, in the wake of Target ending its relationship with Welspun and Wal-Mart's decision not to sell its "100% Egyptian Cotton" bed linens, Welspun has stated that it is changing its quality control and labeling procedures and working with retailers to develop a "comprehensive resolution program."

**C.     Wal-Mart's Conduct Violates The U.S. Textile Fiber Products Identification Act**

28.     The Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. § 70, *et seq.*, and the Rules and Regulations governing it (found at 16 C.F.R. Part 303) apply to the labeling and advertising of textile fiber products, including bed linens, manufactured, sold, advertised, or offered for sale in commerce.

29.     Textile fiber products covered by the Textile Act are required to have a label listing the fiber content, country of origin and identifying the manufacturer or another business responsible for marketing or handling the item.

30.     The fiber disclosure for cotton products may include the name of a type of cotton, such as Egyptian cotton, as long the name is truthful and not deceptive.

31.     Under FTC guidelines, if the type of cotton is included in the product label and the product is made from various kinds of cotton, the label must give the cotton's percentage by weight and make clear that other types of cotton were used to make the product. The FTC gives the following example, "a sheet that contains 65% Pima Cotton and 35% Upland Cotton may be labeled "100% Cotton," "100% Cotton (65% Pima Cotton)," "65% Pima Cotton, 25% Upland Cotton," or "5% Pima Cotton, 35% Other Cotton."

32.     The FTC cotton labeling guidelines go on to say: "If your product contains more than one kind of cotton, a content statement that claims the product is made of only one type of cotton is not acceptable. For example, **when a sheet contains 50% Egyptian Cotton and 50% Upland Cotton, a fiber content label that reads, "100% Egyptian Cotton," is unacceptable**." *See* https://www.ftc.gov/tips-advice/business-center/guidance/calling-it-cotton-labeling-advertising-cotton-products (emphasis added).

33.     Under the Textile Act, the sale, offering for sale, and/or advertising, of "any textile fiber product which has been advertised or offered for sale in commerce, and which is misbranded or falsely or deceptively advertised" … "is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act." *See* 15 U.S.C. § 70a.

34.     "A textile fiber product shall be misbranded if it is falsely or deceptively stamped, tagged, labeled, invoiced, advertised, or otherwise identified as to the name or amount of constituent fibers contained therein." 15 U.S.C. § 70b.

35.     Both manufactures and sellers of textile fiber products, such as Wal-Mart, must comply with the Textile Act.

36.     Wal-Mart's partner, Welspun, is also covered by the Act and is required to maintain records showing compliance with the Textile Act for at least three years. 15 U.S.C.A. §§ 70d(a)-(b). Upon information and belief, such records are located at Welspun's headquarters in this District.

37.     Wal-Mart's conduct, as detailed in this Complaint, violates the Textile Act. Wal-Mart sold, offered for sale, and/or advertised bed linens labeled as "100% Egyptian Cotton" when they were not.

**D.     Injury to Plaintiff**

38.     In February 2014 or 2015, Plaintiff Dorothy Monahan visited a Wal-Mart store located on S. Adams Road in Rochester Hills, Michigan and purchased a set of bed linens.

39.     Plaintiff purchased a set of queen-size Better Homes & Garden sheets, which are labeled "Made in India" and "100% Egyptian Cotton."

40.     On information and belief, the bed linens Plaintiff purchased were 400 Thread Count and Plaintiff paid between $50 and $65 per sheet set.

41.     In purchasing the bed linens, Plaintiff relied on the fact that the bed linens were labeled "100% Egyptian Cotton." Plaintiff believed that the bed linens were indeed 100% Egyptian cotton, and, because of this, she purchased them because she has sensitive skin and believed the bed linens were higher quality, softer, more durable bed linens than other cotton bed linens not made from Egyptian cotton. As a result, Plaintiff paid a premium for the bed linens.

42.     On information and belief, these bed linens are among the Welspun bed linens not containing "100% Egyptian Cotton" as labeled. As a result of Walmart's misrepresentation, Plaintiff was damaged and seeks full reimbursement of all monies paid.

## V.    CLASS ALLEGATIONS

43.    This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4), 23(b)(3).

44.    Plaintiff brings this action as a Class Action on behalf of themselves and all others similarly situated as a member of a Nationwide Class, defined as follows:

> All persons who purchased bed linens from Wal-Mart manufactured by Welspun and labeled "100% Egyptian Cotton."

45.    Upon further investigation and discovery, other products may be discovered to be falsely labeled "100% Egyptian Cotton," and Plaintiff reserves the right to amend the class definition.

46.    Excluded from the Class is Defendant; any entity in which Defendant has a controlling interest; any of the officers, directors, or employees of Defendant; and the legal representatives, heirs, successors and assigns of Defendant.

47.    The members of the Class are so numerous and widely dispersed that joinder of them in one action is impractical. On information and belief, there are thousands of class members who have purchased bed linens at Wal-Mart falsely advertised as "100% Egyptian Cotton."

48.    There are common questions of law and fact as to all members of the Class that predominate over any questions affecting individual class members, including but not limited to:

> a.   Whether Defendant represented the bed linens as 100% Egyptian cotton when they were not;
>
> b.   Whether Defendant knew that the bed linens were not 100% Egyptian cotton;
>
> c.   Whether Defendant knew it had insufficient evidence upon which to represent that the bed linens were made from 100% Egyptian cotton.

d.  Whether Defendant marketed or sold the bed linens as made from 100% Egyptian cotton when in fact they were not.

e.  Whether Defendant charged higher prices for the bed linens that they otherwise would have by labeling them as 100% Egyptian cotton;

f.  Whether Defendant committed fraud under Arkansas law;

g.  Whether Defendant was negligent;

h.  Whether Defendant committed constructive fraud under Arkansas law;

i.  Whether Defendant breached express and implied warranties under Arkansas law;

j.  Whether Defendant was unjustly enriched; and

k.  Whether Plaintiff and class members are entitled to damages, including punitive damages, restitution, injunctive relief, and declaratory relief.

49.     Plaintiff's claims are typical of the Class she seeks to represent. Both Plaintiff and the Class claims arise out of the same course of conduct and same legal theories. Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

50.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of class members she seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation who will vigorously prosecute this action.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the class members is impracticable. Furthermore, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant and the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et seq.*

52.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

53.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), as persons entitled to enforce against the warrantor the obligations of its warranties.

54.    Defendant is a "supplier" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4), because it is "engaged in the business of making a consumer product directly or indirectly available to consumers."

55.    Defendant is a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(5), because it offered a written warranty regarding the nature of the material used to make the linens.

56.    The representations described herein are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6), because they are a written promises made in connection with the sale of a consumer product by a supplier relating to material used to manufacture the linens and affirms that such material is defect free.

57.    In the alternative, the representations described herein are an implied warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7), because the written promises relating to the material used to manufacture the linens are implied warranties

under state law, as described herein, and were made in connection with the sale of the product by a supplier.

58.     The Magnuson-Moss Warranty Act sets forth rules governing warranties "to improve the adequacy of information available to consumers" and to "prevent deception." 15 U.S.C. § 2302(a).

59.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer damaged by the failure of a warrantor to comply with a warranty.

60.     Defendant warranted that the products were 100% Egyptian cotton when in fact they were not 100% Egyptian cotton in violation of the express and/or implied warranties made by Defendant.

61.     A reasonable consumer would believe that the representation made by Defendant regarding the type of cotton used in the product was a true and accurate statement.

62.     The representation that the products were made from 100% Egyptian cotton was deceptive.

63.     Defendant breached its warranties, as described in more detail above, and is therefore liable to Plaintiff and the Class under 15 U.S.C. § 2310(d)(1).

64.     Under 15 U.S.C. § 2310(e), Plaintiff may bring this class action and need not give Defendant notice or an opportunity to cure until the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

65.     The amount in controversy of Plaintiff's individual claims meets or exceeds $25. The amount in controversy exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined. Plaintiff, individually and on behalf of the Class members, seeks all damages permitted by law, including a full refund of the purchase price. In addition,

under 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members may recover the aggregate

costs and expenses (including attorneys' fees based on actual time expended) determined by the

Court to have reasonably been incurred by Plaintiff and the other Class members in the

prosecution of this action.

66.     Further, Plaintiff and the Class are also entitled to equitable relief under 15 U.S.C.

§ 2310(d)(1). Based on Walmart's past conduct of selling Welspun's bed linens for eight years

after its first suspected that the linens were not 100% Egyptian Cotton,  Plaintiff seeks a

declaration that Defendant cannot sell linens labeled 100% Egyptian Cotton that are less than

100% Egyptian Cotton.

## COUNT II

### FRAUD
### Arkansas Law

67.     Plaintiff realleges and incorporates by reference the allegations contained in the

preceding paragraphs.

68.     Wal-Mart falsely represented that the bed linens purchased by Plaintiff and class

members were 100% Egyptian Cotton.

69.     As a result of that representation, Wal-Mart charged a premium for bed linens that

were 100% Egyptian Cotton when compared to comparable linens consisting of other types of

cotton.

70.     The fiber content of the bed linens was a material fact to Plaintiff and class

members' purchases as evidenced by their purchase of linens that were more expensive than

comparable linens whose only material difference was the type of cotton used to manufacture the

linens.

71.     Wal-Mart either had knowledge that its representation was false or that it was based on a deficient investigation and/or lack of quality control, it had insufficient evidence upon which to make the representation that the bed linens were 100% Egyptian cotton.

72.     Wal-Mart intended for Plaintiff and class members to rely on its representation and pay a premium for the purportedly premium "100% Egyptian Cotton" bed linens. Indeed, the sole purpose of the representation was to induce Plaintiff and class members to purchase Defendant's bed linens.

73.     Plaintiff and class members justifiably relied on Wal-Mart's false representation that the bed linens were 100% Egyptian cotton.

74.     As a result of Wal-Mart's false representation, Plaintiff and class members were damaged. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

## COUNT III

### CONSTRUCTIVE FRAUD
### Arkansas Law

75.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

76.     Pursuant to the Textile Act, Wal-Mart has a legal duty to offer for sale bed linens that are labeled with true and accurate information regarding their fiber content.

77.     Wal-Mart also has an equitable duty to Plaintiff and class members to use reasonable care to ensure that its bed linens are labeled with true and accurate information regarding their fiber content.

78.     The fiber content of the bed linens was material fact to Plaintiff and class members' purchases.

14

79.     Wal-Mart falsely represented that the bed linens purchased by Plaintiff and class members were 100% Egyptian cotton.

80.     Wal-Mart's false representation was of a type considered fraudulent because of its tendency to deceive others.

81.     Wal-Mart either knew that its representation was false or not knowing, asserted it to be true.

82.     Plaintiff and class members justifiably relied on Wal-Mart's false representation that the bed linens were 100% Egyptian cotton.

83.     As a result of Wal-Mart's false representation, Plaintiff and class members were damaged. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

**COUNT IV**

**NEGLIGENCE**
**Arkansas Law**

84.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

85.     Pursuant to the Textile Act, Wal-Mart has a legal duty to offer for sale bed linens that are labeled with true and accurate information regarding their fiber content.

86.     Wal-Mart also has a duty to Plaintiff and class members to use reasonable care to ensure that its bed linens are labeled with true and accurate information regarding their fiber content.

87.     Prior to August 2016, Wal-Mart knew or should have known about the limited supply of Egyptian cotton and its premium cost.

88.     Wal-Mart breached its legal duty and duty of care owed to Plaintiff and class members when it falsely represented that the bed linens purchased by Plaintiff and class members were 100% Egyptian cotton.

89.     Wal-Mart breached its legal duty and duty of care owed to Plaintiff and class members by not conducting an adequate investigation or maintaining sufficient quality control practices to determine and monitor the fiber content of Welspun's bed linens.

90.     Wal-Mart's negligence was the proximate cause of the damages alleged by Plaintiff and class members. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

## COUNT V

## BREACH OF EXPRESS WARRANTY
### Ark. Code Ann. § 4-2-313

91.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

92.     Plaintiff and class members are "buyers" of goods within the meaning of Ark. Code Ann. § 4-2-103.

93.     Wal-Mart is a "seller" of goods within the meaning of Ark. Code Ann. § 4-2-103.

94.     The bed linens are "goods" within the meaning of Ark. Code Ann. § 4-2-105.

95.     Wal-Mart made an affirmation of fact and described the bed linens as "100% Egyptian Cotton." This affirmation of fact and description became part of the basis of the bargain with Plaintiff and consumers.

96.     Therefore, the affirmation of fact and description of the bed linens as "100% Egyptian Cotton" created an express warranty.

16

97.     Wal-Mart breached the express warranty because the bed linens were not 100% Egyptian cotton.

98.     As a result of Wal-Mart's breach of the express warranty, Plaintiff and class members were damaged. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

99.     Plaintiff has provided notice to Defendant as required by Ark. Code Ann. § 4-86-101.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ark. Code Ann. § 4-2-314

100.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

101.     Plaintiff and class members are "buyers" of goods within the meaning of Ark. Code Ann. § 4-2-103.

102.     Wal-Mart is a "seller" of goods within the meaning of Ark. Code Ann. § 4-2-103.

103.     The bed linens are "goods" within the meaning of Ark. Code Ann. § 4-2-105.

104.     The contract for the sale of the bed linens included an implied warranty that they were merchantable, extending to Plaintiff and class members.

105.     The bed linens were labeled "100% Egyptian Cotton" but were not in fact 100% Egyptian cotton. Pursuant to Ark. Code Ann. § 4-2-314, the bed linens, as labeled, did not pass without objection in the trade under the contract description; conform to the promises or affirmations of fact made on the container or label; and are not fit for the ordinary purposes for which such goods are used.

106.     As a result of Wal-Mart's breach of the implied warranty of merchantability, Plaintiff and class members were damaged. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

107.     Plaintiff has provided notice to Defendant as required by Ark. Code Ann. § 4-86-101.

## COUNT VII

### UNJUST ENRICHMENT
### Arkansas Law

108.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

109.     Wal-Mart falsely represented that the bed linens purchased by Plaintiff and class members were 100% Egyptian cotton. Wal-Mart intended for Plaintiff and class members to rely on its representation.

110.     Plaintiff and class members reasonably relied on Wal-Mart's representation and suffered a detriment. They paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

111.     Wal-Mart received money, in the form of the premium Plaintiff and class members paid for the bed linens, to which it was not entitled because the bed linens were not made from 100% Egyptian cotton.

112.     Wal-Mart was unjustly enriched by the amount of premium Plaintiff and class members paid for the bed linens.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and for members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

a)       Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel and Plaintiff as Class Representatives;

b)       Costs, restitution, damages, including statutory and punitive damages, and disgorgement in an amount to be determined at trial;

c)       An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

d)       An award of costs and attorneys' fees; and

e)       Such other or further relief as may be appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

Dated: November 8, 2016.                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  s/ Jason A. Zweig
_____
Jason A. Zweig
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 752-5455
Facsimile: (212) 210-3980
jasonz@hbsslaw.com

Robert B. Carey *(pro hac vice* pending)
Leonard W. Aragon *(pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Stuart M. Paynter *(pro hac vice* pending)
Jennifer L. Murray
THE PAYNTER LAW FIRM PLLC
1200 G. Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com
jmurray@paynterlawfirm.com